IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| IVAN D. FOSTER, | |
| Plaintiff, | |
| v. | Civil No. 20-1905 (RBK/JS) |
| | **OPINION** |
| DR. STEPHEN KLASKO, *et al.*, | |
| Defendants. | |

**KUGLER**, United States District Judge:

This matter comes before the Court on *pro se* Plaintiff Ivan D. Foster's Verified Complaint (Doc. No. 1 ("Compl.")) and application to proceed *in forma pauperis* ("IFP") (Doc. No. 1-1). Due to complications from his hypertension and chronic kidney disease ("CKD"), over the past two months Plaintiff has repeatedly visited the emergency rooms ("ERs") of hospitals operated by Defendant Thomas Jefferson University Hospital Inc. ("Jefferson"). Plaintiff claims that on each of those visits Jefferson failed to comply with the screening and stabilization requirements of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. He further claims that certain Jefferson doctors have committed malpractice, resulting in a deterioration of his condition. The Court has already granted Plaintiff's application to proceed IFP (Doc. No. 2), but pursuant to 28 U.S.C. § 1915(e)(2) must now screen the Complaint to determine whether Plaintiff's action is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from an immune defendant. For the reasons set forth below, Plaintiff's Complaint is **DISMISSED**.

## I. BACKGROUND

### A. Factual Background

Plaintiff is a fifty-four-year-old African-American man suffering from CKD, cardiac stress, and hypertension. (Compl. at ¶¶ 1, 50). Seeking treatment for his condition, he visited the ER of Jefferson's Stratford, New Jersey hospital on January 1, 2020, January 2, 2020, January 4, 2020, January 16, 2020, January 17, 2020, January 22, 2020, January 23, 2020, multiple times on January 24, 2020, January 25, 2020, January 29, 2020, multiple times on February 2, 2020, multiple times on February 3, 2020, February 5, 2020, multiple times on February 9, 2020, and February 17, 2020. (*Id*. at ¶ 2). He also visited the ER of Jefferson's Cherry Hill, New Jersey hospital every day from January 7, 2020 through January 13, 2020. (*Id*.).

Plaintiff asserts that he was repeatedly discharged despite exhibiting high blood pressure. (*Id*. at ¶¶ 12–13). He also contends that Jefferson refused to perform a doppler ultrasound on his kidneys or to order a cholesterol test, either of which could have determined if there is blockage in the blood flow of his kidneys. (*Id*. at ¶ 36).

During his visit to Jefferson-Stratford on January 1, Plaintiff was treated by a Dr. Pagano. (*Id*. at ¶ 62). Plaintiff complained that Dr. Pagano was not treating him quickly enough after sitting and throwing up for two hours without treatment. (*Id*. at ¶ 63). On January 4, Plaintiff returned to the Jefferson-Stratford ER, where Dr. Pagano treated him again. (*Id*. at ¶ 62). Before receiving treatment, Plaintiff was forced to sit near the doctors' station for two hours, during which time his blood pressure climbed from 162/90 to 220/121. (*Id*. at ¶ 37). Dr. Pagano wished to treat Plaintiff with an IV, but Plaintiff refused treatment because he did not trust Dr. Pagano; Plaintiff requested oral medication instead. (*Id*. at ¶ 62). Dr. Pagano refused, and Plaintiff was discharged with blood

pressure around 198/111, even though his normal blood pressure is around 126/79. (*Id*. at ¶¶ 13, 63).

During Plaintiff's January 16 visit to Jefferson-Stratford, Jefferson doctors performed a non-doppler ultrasound on Plaintiff's kidneys. (*Id*. at ¶ 9; Doc. No. 1-2 at 1). This ultrasound revealed a "subcentimeter low-attenuation lesion at the upper left kidney which is too small to characterize although may represent a cysts [sic]" and a similar possible cyst on Plaintiff's right kidney. (Compl. at ¶ 9; Doc. No. 1-2 at 6). The next day, Plaintiff again visited Jefferson-Stratford's ER. On this visit, Defendant Dr. Tessdale ordered a contrast CT scan of Plaintiff's aortic artery. (Compl. at ¶¶ 8, 42). Plaintiff asserts that due to the cysts on his kidneys, this CT scan permanently damaged his kidneys, causing him to develop CKD. (*Id*. at ¶¶ 8–9).

On one of his February 2 visits to Jefferson-Stratford, Plaintiff sat in the ER and vomited repeatedly. (*Id*. at ¶ 56). His condition was not treated. (*Id*.). Later, he was removed from the ER with an IV in his arm. (*Id*. at ¶ 57).

During his February 17 visit to Jefferson-Stratford, Plaintiff requested a doppler ultrasound from a Dr. Lucernia. (*Id*. at ¶ 5). Dr. Lucernia told Plaintiff that he could not order a doppler ultrasound from the ER. Plaintiff then asked for a transfer to a hospital that would perform a doppler ultrasound, but Dr. Lucernia said he could not do so without an expecting doctor because that would violate EMTALA. (*Id*. at ¶ 6). Plaintiff did receive a non-doppler ultrasound on this visit. (*Id*. at ¶ 40). Later, Plaintiff called the ER departments at Jefferson's Stratford, Cherry Hill, Washington Township, New Jersey, and Philadelphia, Pennsylvania hospitals, and was told that an ER doctor can order a doppler ultrasound. (*Id*. at ¶ 5).

In addition to developing CKD, Plaintiff claims that his visits to Jefferson have caused him to develop an inverted t-wave in his heart. (*Id*. at ¶ 53). He has also suffered mental anguish and experienced pain due to Defendants' actions. (*Id*. ¶ 58).

**B. Procedural History**

Plaintiff filed his Complaint on February 21, 2020, along with a Motion for a Temporary Restraining Order ("TRO") (Doc. No. 2). Plaintiff sought a TRO requiring Jefferson to perform a doppler ultrasound on his kidneys to determine whether there are any cysts inside of his kidneys. (Doc. No. 2 at 2). On February 24, the Court denied Plaintiff's Motion for a TRO but granted his IFP application. (Doc. Nos. 4, 5).

Plaintiff has three primary claims. First, he alleges that Jefferson has repeatedly failed to properly screen him for an emergency medical condition, in violation of EMTALA. Second, he asserts that Jefferson has repeatedly failed to stabilize his condition, also in violation of EMTALA. Third, he claims that Jefferson doctors have committed malpractice against him, in particular Dr. Tessdale by performing the CT scan that caused Plaintiff to develop CKD. In addition to these claims, Plaintiff also makes passing mention of 42 U.S.C. § 1985(3) and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.; he also makes vague assertions that Dr. Stephen Klasko, Jefferson's chief executive officer, and Kelly Walenda, a Jefferson lawyer, are engaged in some sort of conspiracy to defraud the public. (Compl. at ¶¶ 19, 22, 25).

**II. LEGAL STANDARD**

District courts must review IFP complaints and *sua sponte* dismiss any action or appeal that "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). "Whether a complaint should be dismissed under § 1915 because it fails to state a

claim is assessed under the same standard as a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Rhodes v. Maryland Judiciary*, 546 F. App'x 91, 93 (3d Cir. 2013).

When evaluating a 12(b)(6) motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). A complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). It is not for courts to decide at this point whether the non-moving party will succeed on the merits, but "whether they should be afforded an opportunity to offer evidence in support of their claims." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002). While "detailed factual allegations" are not necessary, a "plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations omitted); see also *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

As Plaintiff is proceeding *pro se*, the Court is mindful of its "duty to construe [the] pleadings liberally and apply the applicable law, irrespective of whether [plaintiff has] mentioned it by name." *Rose v. Ortiz*, No. 14-1738, 2015 WL 9216589, at *1 (D.N.J. Dec. 16, 2015) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013)).

### III. JURISDICTION

By pleading claims under EMTALA, 42 U.S.C. § 1985, and the ADA, Plaintiff invokes the Court's federal-question jurisdiction under 28 U.S.C. § 1331. However, the allegations in

5

Plaintiff's Complaint are insufficient to invoke the Court's diversity jurisdiction under 28 U.S.C. § 1332. To invoke diversity jurisdiction, the plaintiff must demonstrate that there is "complete diversity, meaning that no plaintiff can be a citizen of the same state as any of the defendants," *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 346 (3d Cir. 2013) (internal quotation omitted), and that there is an amount in controversy exceeding $75,000, *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004). Mere averments of residency are "jurisdictionally inadequate in [a] diversity of citizenship case." *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 219 n.4 (3d Cir. 2012) (citing *Krasnov v. Dinan*, 465 F.3d 1298, 1300 (3d Cir. 1972)). Further, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business," 28 U.S.C. § 1332(c)(1).

In this case, Plaintiff has only pleaded that he is a resident, rather than a citizen, of New Jersey. (Compl. at ¶ 20). Similarly, he pleads that Jefferson is incorporated in and "resides" in Pennsylvania. (*Id*. at ¶ 21). Further, he makes no averments as to the residency or citizenship of the other three named defendants, Dr. Stephen Klasko, Kelly Walenda, and Dr. Tessdale. Due to these numerous defects, Plaintiff's Complaint does not demonstrate that there is a complete diversity of citizenship amongst the parties, and therefore does not invoke the Court's diversity jurisdiction.

## IV. DISCUSSION

The Court begins by analyzing Plaintiff's EMTALA claims. Finding these inadequate, the Court then considers Plaintiff's other federal law theories, including claims under 42 U.S.C. § 1985(3) and the ADA. After concluding that none of Plaintiff's federal claims are viable, the Court

declines to exercise its supplemental jurisdiction to hear Plaintiff's state law claims. As such, all of Plaintiff's claims are dismissed.

### A. EMTALA

EMTALA requires hospitals to provide emergency patients with "an appropriate medical screening examination . . . to determine whether or not an emergency medical condition exists." 42 U.S.C. § 1395dd(a).[1] If screening reveals an emergency medical condition, the hospital is required to provide stabilizing treatment, or to transfer the patient to another hospital that can provide such treatment. 42 U.S.C. § 1395dd(b)(1); *Torretti v. Main Line Hosp., Inc.*, 580 F.3d 168, 172 (3d Cir. 2009) ("EMTALA requires hospitals to give certain types of medical care to individuals presented for emergency treatment: (a) appropriate medical screening, (b) stabilization of known emergency medical conditions and labor, and (c) restrictions on transfer of unstabilized individuals to outside hospital facilities."). EMTALA does not create a federal cause of action for malpractice, but it does allow private plaintiffs to sue when hospitals fail to provide an appropriate screening and when hospitals fail to stabilize an emergency medical condition. 42 U.S.C. § 1395dd(d)(2)(A); *see Toretti*, 580 F.3d at 172 (noting that under EMTALA "[l]iability is determined independently of whether any deficiencies in the screening or treatment provided by

---

[1] EMTALA defines an emergency medical condition as

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>
> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>
> (ii) serious impairment to bodily functions, or
>
> (iii) serious dysfunction of any bodily organ or part

42 U.S.C. § 1395dd(e)(1).

7

the hospital may be actionable as negligence or malpractice"). Plaintiff is bringing both failure-to-screen and failure-to-stabilize claims against Defendant Jefferson.[2]

### i. Failure-to-Screen

While the statute leaves the term "appropriate medical screening" undefined, the Third Circuit has indicated that EMTALA generally only requires hospitals to screen similarly situated patients according to the same procedures. *See Byrne v. Cleveland Clinic*, 519 F. App'x 739, 742 (3d Cir. 2013) (explaining that "[i]t is up to the hospital itself to determine what its screening procedures will be. Having done so, it must apply them alike to all patients" (internal quotation marks omitted) (quoting *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir. 1996))); *see also McClure v. Parvis*, 294 F. Supp. 3d 318, 324 (E.D. Pa. 2018) (explaining that "to state an EMTALA failure-to-screen claim, the plaintiff must allege that: (1) the patient had an emergency medical condition; and (2) the hospital did not screen the patient in the same way it screens other patients presenting with similar symptoms"). At the same time, the screening procedure cannot be "so cursory that it would fail 'to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.'" *McCann v. Kennedy Univ. Hosp., Inc.*, 596 F. App'x 140 (3d Cir. 2014) (quoting *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir. 2001)).

Plaintiff contends that Jefferson repeatedly denied him an adequate medical screening because he never received a doppler ultrasound or a cholesterol test on any of his ER visits. (Compl. at ¶¶ 17, 36). According to Plaintiff, at least one of these procedures is necessary to determine whether there is a blockage of blood flow in his kidneys, and the doppler ultrasound

---

[2] Plaintiff does not specify which Defendants he believes to be liable for the alleged EMTALA violations. Nevertheless, Jefferson is the only proper defendant because EMTALA provides a cause of action against hospitals, not against individual doctors or administrators. 42 U.S.C. § 1395dd(d)(2)(A); *Davis v. Twp. of Paulsboro*, 424 F. Supp. 2d 773, 778–79 (D.N.J. 2006).

8

specifically is necessary to determine if there are cysts inside his kidneys. (*Id.*; Doc. No. 1-3 at 1). However, Plaintiff has made no allegations suggesting that Jefferson routinely provides doppler ultrasounds and cholesterol tests to similarly situated patients.[3] Nor do Plaintiff's allegations indicate that Jefferson provided him with a cursory screening—after all, the non-doppler ultrasound Plaintiff received on January 16 did reveal the presence of possible cysts on his kidneys. (Compl. at ¶ 9; Doc. No. 1-2 at 6). Even if there is something to be gained by conducting a doppler ultrasound and/or a cholesterol test, Plaintiff provides no indication that they were necessary to "alert the physician of the need for immediate medical attention to prevent serious bodily injury" on any of the occasions he visited a Jefferson ER.

Plaintiff does allege that Dr. Tessdale seriously injured him on January 17 by performing a CT scan on his aortic artery, despite the presence of cysts on his kidneys. But Plaintiff contends that Dr. Tessdale was negligent in performing this CT scan because Dr. Tessdale should have been aware of the ultrasound results from the previous day, showing that Plaintiff had possible cysts on his kidneys. (Compl. at ¶¶ 8, 42). Hospitals are not liable under EMTALA if they fail to correctly interpret or abide by the results of their screening tests, so long as those tests are performed. *See Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 2013) (explaining that "faulty screening, in a particular case . . . does not contravene the statute"); *Kenyon v. Hosp. San Antonio, Inc.*, at 951 F. Supp. 2d 255, 263 (D.P.R. 2013) (denying failure-to-screen claim where hospital provided screening that should have led to diagnosis of renal failure, but doctors failed to make

---

[3] Plaintiff does allege that Dr. Lucernia denied him a doppler ultrasound on the grounds that ER doctors are not allowed to order such a test, even though Jefferson's policies do allow ER doctors to order doppler ultrasounds. (Compl. at ¶ 5). But even if Jefferson ER doctors *can* order doppler ultrasounds, Plaintiff has not alleged that Jefferson doctors do in fact order doppler ultrasounds for similarly situated patients. Without such an allegation, Dr. Lucernia's misrepresentation is immaterial to Plaintiff's EMTALA claim.

9

such a diagnosis). Since such negligence is properly the subject of a state law malpractice claim, the January 17 incident cannot serve as the basis for a failure-to-screen claim.

Plaintiff also alleges that he had to wait an unduly long period of time before receiving a screening examination during his January 1, January 4, and February 2 visits to Jefferson-Stratford. (Compl. at ¶¶ 37, 63). Allegations of a delayed screening allow a failure-to-screen claim to survive a motion to dismiss if the "delay in screening result[s] in the failure to identify, treat, and stabilize an emergent condition" and the plaintiff's screening delay differed from that experienced by similarly situated patients. *See McClure*, 294 F. Supp. 3d at 325 (citing *Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 709, 713–14 (4th Cir. 1993)) (allowing failure to screen claim to survive motion to dismiss where plaintiff alleged that hospital's delay in screening diverged from treatment of similarly situated patients). As discussed below, Plaintiff has not adequately alleged that Jefferson failed to stabilize his condition during his January 1, January 4, and February 2 visits. And again, Plaintiff has not alleged that his treatment during these visits differed from Jefferson's treatment of similarly situated patients. As such, all of Plaintiff's failure to screen claims fail.

    ii. *Failure-to-Stabilize*

In order to make out a failure-to-stabilize claim, a plaintiff must show that he "(1) had an emergency medical condition; (2) the hospital actually knew of that condition; and (3) the [plaintiff] was not stabilized before being transferred." *Toretti*, 580 F.3d at 178. [4] A plaintiff is stabilized under EMTALA if "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual." 42 U.S.C. § 1395dd(e)(3)(B).

---

[4] Under EMTALA "[t]he term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities." 42 U.S.C. § 1395dd(e)(4).

Plaintiff claims that Jefferson failed to stabilize his condition every time he visited the ER prior to his February 17, 2020 visit to Jefferson-Stratford. (Compl. at ¶ 40). He asserts that the fact that he had to continually return to the ER is by itself sufficient evidence that his condition was not stabilized. (*Id*. at ¶ 40). Yet actual deterioration of a patient's condition after discharge is not sufficient evidence that the patient's condition was *likely* to deteriorate at the time of discharge. *See Delibertis v. Pottstown Hosp. Co. LLC*, 152 F. Supp. 3d 394 (E.D. Pa. 2016) (finding that patient was stabilized for EMTALA purposes even though patient's condition deteriorated shortly after discharge). With two exceptions, Plaintiff has not alleged specific facts suggesting that a material deterioration of his condition was likely to occur on any of the numerous occasions he was discharged from Jefferson hospitals. Indeed, Plaintiff has not alleged any concrete facts at all regarding what occurred on most of his ER visits. As such, his failure-to-stabilize claims based on these ER visits must be dismissed.

The two exceptions are Plaintiffs January 4 and February 2 visits to Jefferson-Stratford. On February 2, Plaintiff alleges that he was discharged from the ER with an IV still in his arm (Compl. at ¶ 57). But while the presence of the IV may indicate that Plaintiff had not fully recovered, it does not, standing alone, provide any indication that Plaintiff's condition was likely to materially deteriorate due to the discharge. As such, the claim predicated on the February 2 visit fails.

The allegations surrounding the January 4 visit are somewhat more robust. Plaintiff alleges that his blood pressure reached 220/121 during this visit, and only fell to 198/111 before he left the hospital. (Compl. at ¶¶ 13, 37). Hospitals may violate EMTALA by discharging patients with elevated blood pressure. *See Love v. Rancocas Hosp.*, No. 01-5456, 2005 WL 1541052, at *1, *6 (D.N.J. June 29, 2005) (denying summary judgment on EMTALA claim where hospital discharged

11

plaintiff whose last blood pressure reading prior to discharge was 180/110). But EMTALA immunizes hospitals if they offer stabilizing treatment to patients only for the patient to refuse to consent to such treatment. 42 U.S.C. § 1395dd(b)(2); *see Weaver v. Hand*, 20 F.3d 466 (5th Cir. 1994) (finding hospital fulfilled EMTALA obligations where patient's family refused to accept treatment from the hospital on patient's behalf). On January 4, Jefferson discharged Plaintiff only after he refused Dr. Pagano's offer of IV treatment. (Compl. at ¶ 62). Because Plaintiff refused the treatment Jefferson offered him, Plaintiff's allegations indicate that Jefferson is not liable under EMTALA, despite Jefferson discharging him without stabilizing his blood pressure. Consequently, even this claim is not viable.

### B. Other Federal Claims

Plaintiff's Complaint invokes 42 U.S.C. § 1985(3), asserting that Defendants have conspired to deny him stabilizing treatment due to his race. (Compl. at ¶ 50). In order to state a Section 1985(3) claim, a plaintiff must allege:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (internal quotation omitted). While Plaintiff more or less recites the formal elements of a Section 1985(3) claim, recitation of the formal elements is not enough. *Twombly*, 550 U.S. at 555. He fails to offer any allegations concerning the formation of the conspiracy, and only offers only a conclusory assertion as to its purpose. (*See* Compl. at ¶ 50). As such, he has failed to state a Section 1985(3) claim. *See P.K. ex rel. Koutzis v. Melleby*, No. 18-485, 2019 WL 4072114, at \*8 (D.N.J. Aug. 28, 2019) (dismissing

Section 1985(3) claim where plaintiff failed to make any "allegation, conclusory or otherwise, that [d]efendants (1) came to an agreement or (2) what constituted the agreement").[5]

Plaintiff also seeks to state a claim under the ADA. In its entirety on this point, his Complaint reads: "I allege that the defendants [sic] actions also violate the ADA American [sic] with Disabilities act [sic] because I have had 6 herniated disc [sic] since 2001." (Compl. at ¶ 50). Title III of the ADA prohibits discrimination "on the basis of disability" by "any person who owns, leases (or leases to), or operates a place of public accommodation," 42 U.S.C. § 12182(a), and Jefferson's hospitals are places of public accommodation within the meaning of the ADA, 42 U.S.C. § 12181(7)(F). But such a supremely vague and conclusory allegation is plainly insufficient to state a claim. As such, Plaintiff's ADA claim must be dismissed.

### C. State Law Claims

Plaintiff asserts that Defendants' conduct violated state malpractice law. However, as the Court has dismissed all of Plaintiff's federal claims for the reasons set forth above, the Court declines to exercise supplemental jurisdiction over his state law claims. *See* 28 U.S.C. § 1367(c)(3); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (instructing that after dismissing original jurisdiction claims, district courts "must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so"). Accordingly, Plaintiff's state law claims are dismissed as well.

### V. CONCLUSION

---

[5] Plaintiff's claim could alternatively be construed as an attempt to invoke Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, *et seq*. To prevail on a Title VI claim, the plaintiff must show "(1) that there is racial or national origin discrimination; and (2) the entity engaging in the discrimination is receiving federal financial assistance." *Barker v. Our Lady of Mount Carmel Sch.*, No. 12-4308, 2016 WL 4571388, at *10 (D.N.J. Sept. 1, 2016) (internal quotation omitted). But again, Plaintiff's allegation of racial discrimination is wholly conclusory, and consequently cannot serve as the basis for a Title VI claim.

For the forgoing reasons, Plaintiff's Complaint is **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). An Order follows.


Dated: 02/26/2020                                         /s/ Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Judge